**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:19-cv-00626-DME-KLM

OTTER PRODUCTS, LLC, and
TREEFROG DEVELOPMENTS, INC.,

      Plaintiffs – Counterclaim Defendants,

v.

BIG BIRDS, LLC, and
DAVID PAIGE,

      Defendants – Counterclaim Plaintiffs,

JOHN DOES 1-10, individually or as corporate entities,

      Defendants.

---

## ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT (Docs. 82, 87)

---

This trademark infringement action is before the Court on the parties' cross-motions for summary judgment.  (Docs. 82, 87.)  The Court GRANTS Otter summary judgment on Big Birds' third counterclaim.  The Court otherwise DENIES both motions because there remain genuinely disputed issues of material fact that a jury must resolve.

## I. BACKGROUND

Plaintiffs Otter Products, LLC and its subsidiary Treefrog Developments, Inc. (collectively "Otter") manufacture and market accessories for electronic devices under

the OtterBox® and LifeProof® brands.  Otter has registered trademarks for these products.  This litigation involves primarily Otter's cell phone cases.

Otter sells its products on its own website, and to cell phone carriers like AT&T, Verizon, and T-Mobile, and large national retailers like BestBuy, Target, Wal-Mart and Amazon.  Otter also has approximately 4,900 smaller authorized sellers, as well as five secondary resellers which Otter has authorized to sell outdated or excess Otter products.  Otter authorized several of these secondary resellers to sell Otter products as third-party sellers on Amazon.  So both Amazon and several of Otter's authorized secondary resellers sell Otter products on Amazon.com.

Defendant David Paige owns and operates Defendant Big Birds, LLC (collectively "Big Birds").  Big Birds is not an authorized Otter seller.  Big Birds buys Otter's trademarked products on the open market and resells them as a third-party seller on Amazon, using storefronts named Helping Hippos and Frantic Frogs.  Otter claims, among other things, that Big Birds selling Otter products on Amazon without Otter's authorization infringes Otter's trademarks.  Big Birds counters that Otter cannot use its trademarks to control the distribution of its products past Otter's first sale of those products.

After sending Big Birds several cease-and-desists letters, Otter initiated this litigation, asserting claims under federal and Colorado law for trademark infringement, false advertising, unfair competition, and deceptive trade practices.  Otter asks for a jury trial and seeks injunctive relief and damages.  Big Birds, in turn, asserted three counterclaims seeking a declaratory judgment stating that it is neither violating Otter's

2

trademarks nor tortiously interfering with Otter's contracts or business relations, and seeking damages from Otter for interfering with Big Birds' prospective economic advantage.  Both sides have now moved for summary judgment on most of these claims.[1]

## II. SUMMARY JUDGMENT STANDARD

The Court considers cross-motions for summary judgment separately and, for each motion, views the evidence and the reasonable inferences to be drawn therefrom in the light most favorable to the non-moving party.  See Banner Bank v. First Am. Title Ins. Co., 916 F.3d 1323, 1326 (10th Cir. 2019).  The Court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

## III. PERSONAL JURISDICTION

As an initial matter, Defendants David Paige and his business, Big Birds, LLC, argue that the Court lacks personal jurisdiction over them.  It is Otter's burden to establish that this Court has personal jurisdiction over these Defendants.  See XMission, L.C. v. Fluent LLC, 955 F.3d 833, 839 (10th Cir. 2020).

Defendants Paige and Big Birds are residents of Maryland with no physical presence in Colorado.  The Court previously denied Defendants' Fed. R. Civ. P.

---

[1] After the parties filed their summary judgment motions, Otter abandoned a federal claim for trademark dilution (Claim 4) and a state-law claim for tortious interference with contract and business relations (Claim 7).  The parties also previously stipulated to the dismissal with prejudice of Otter's claims against two other defendants, Dave's Market and Judah Holland, as well as the counterclaims Dave's Market and Holland asserted against Otter.  See Fed. R. Civ. P. 41(a)(1)(A)(ii).  Further, although Otter named John Does 1 through 10 as defendants, Otter has never identified any additional defendants.

12(b)(2) motion to dismiss Otter's claims against them for lack of personal jurisdiction, ruling Otter had made a prima facie showing of personal jurisdiction by alleging that Big Birds sold to Colorado residents products purportedly infringing Otter's trademarks. Defendants now seek to revisit that ruling in their summary judgment motion.  See Dudnikov v. Chalk & Vermilion Fine Arts, Inc., 514 F.3d 1063, 1069 n.3 (10th Cir. 2008) (noting that, "even if personal jurisdiction is contested and found initially on the pleadings . . ., it may be reviewed again at subsequent stages in the trial court proceedings as evidence accumulates").  Defendants, however, make no new arguments nor present any new evidence that causes the Court to question its prior ruling.

Defendants argue, for the first time in their reply brief in support of their summary judgment motion, that Otter "fail[s] to advance **any** evidence supporting the Court's exercise of jurisdiction over Mr. Paige," apparently meaning separate from Big Birds. (Doc. 101 at 5.)  Certainly the Court must have personal jurisdiction over each Defendant.  See Home-Stake Prod. Co. v. Talon Petroleum, C.A., 907 F.2d 1012, 1020 (10th Cir. 1990).  Otter, however, alleged in its amended complaint that this Court had personal jurisdiction over both Big Birds and, separately, Paige.  Defendants, in their earlier Rule 12(b)(2) motion to dismiss, did not challenge the sufficiency of those allegations as they pertained to Paige, separate from his company Big Birds.  Instead, in their motion to dismiss, Defendants treated themselves collectively in arguing that their sales to Colorado residents over Amazon were insufficient to establish personal

4

jurisdiction.[2]  Nor did Defendants challenged this Court's personal jurisdiction over Paige, separate from Big Birds, in their summary judgment motion.  Instead, they asserted that argument, only perfunctorily, for the first time in their reply brief in support of summary judgment.

Defendants have, thus, twice forfeited their argument that Otter has failed to establish personal jurisdiction over Paige, separate from his company Big Birds.  See Flambeau, Inc. v. GDL Brokerage, Inc., No. 19-cv-359-jdp, 2019 WL 6877564, at *3 (W.D. Wis. Dec. 17, 2019) (unreported) (holding party forfeited new argument challenging personal jurisdiction, raised for the first time in reply brief in support of motion to dismiss); see also Rodriguez v. Cascade Collections LLC, —F. Supp. 3d—, 2021 WL 1222147, at *12 (D. Utah Mar. 31, 2021) (deeming party to have waived argument raised for the first in in reply brief filed in support of summary judgment motion, noting such a belatedly raised argument deprives "the nonmoving party . . . of an opportunity to cite evidence creating a dispute of material fact").  See generally Est. of Cummings ex rel. Montoya v. Cmty. Health Sys., Inc., 881 F.3d 793, 799 (10th Cir. 2018) (noting party can waive lack-of-personal-jurisdiction defense).

Even if not forfeited, however, Defendants have not adequately presented their current argument that the Court lacks jurisdiction over Paige.  Defendants only included a single sentence in their reply brief, asserting only that Otter "fail[s] to advance any evidence supporting the Court's exercise of jurisdiction over Mr. Paige."  (Doc. 101 at

---

[2] Defendants' Rule 12(b)(2) motion included, not only Paige and his company Big Birds, but also now-dismissed Defendants Judah Holland and Dave's Market, LLC.

5.)  See Grimaldo v. Reno, 189 F.R.D. 617, 619 (D. Colo. 1999) (holding, in addressing Rule 12(b)(5) challenge to service of process, that party waives an argument when he fails to provide proper support for, or only superficially develops, it).

The Court, therefore, concludes it has personal jurisdiction over both remaining Defendants.

## IV.  OTTER'S CLAIMS

### A.  Claims 1, 3 and 5: Trademark infringement and unfair competition under the Lanham Act, 15 U.S.C. §§ 1114 and 1125(a), and Colorado common law

Otter contends that Big Birds is infringing Otter's trademarks by reselling Otter products on Amazon without Otter's authorization to do so, and that this infringement amounts to unfair competition.  Big Birds counters that a trademark owner cannot control sales of its products after the first sale, and that Big Birds is only reselling genuine Otter products that Big Birds bought on the open market, which is not infringement.  Otter disputes that the products Big Birds is reselling are "genuine." Because there are disputes of material fact as to whether the Otter products Big Birds is reselling on Amazon are "genuine," neither side is entitled to summary judgment on the infringement and unfair competition claims.

#### 1. Otter's infringement and unfair competition claims

Otter specifically alleges that Big Birds is infringing Otter's trademarks, in violation of the Lanham Act, 15 U.S.C. §§ 1114 and 1125(a)(1)(A) (Claim 1) and Colorado common law (Claim 5), and is engaging in unfair competition, in violation of the Lanham Act, 15 U.S.C. § 1125(a) (Claim 3).  The parties agree that all three claims require Otter to prove the same elements: 1) Otter "has a protectable interest in the

6

trademark[s]"; 2) Big Birds "has used an identical or similar trademark in commerce"; and 3) Big Birds "has likely confused customers by using a similar trademark."  Derma Pen, LLC v. 4EverYoung Ltd., 773 F.3d 1117, 1120 (10th Cir. 2014) (addressing federal Lanham Act claims for trademark infringement and unfair competition).[3]  Big Birds does not dispute that Otter has met the first two elements of these claims.

"[T]he central inquiry in a trademark infringement case is the likelihood of consumer confusion."  Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC, 562 F.3d 1067, 1071 (10th Cir. 2009).  "The party alleging infringement has the burden of proving likelihood of confusion."  Australian Gold, Inc. v. Hatfield, 436 F.3d 1228, 1238 (10th Cir. 2006).[4]

---

[3] See also Donchez v. Coors Brewing Co., 392 F.3d 1211, 1213, 1219 (10th Cir. 2004) (identifying these elements as applicable to common law trademark infringement claim); Atlas Biologicals, Inc. v. Kutrubes, No. 15-CV-00355-CMA-KMT, 2019 WL 4594274, at *6 (D. Colo. Sept. 23, 2019) (unreported) ("The elements of common law trademark infringement in Colorado are virtually indistinguishable from those required to provide trademark infringement under the Lanham Act.").

[4] In its amended complaint and throughout its pleadings, Otter asserts that Amazon's platform for selling goods causes consumer confusion.  For example, Otter asserts that

> Amazon allows one listing for every product on its platform and lists all sellers of the product—authorized or not—under the same listing.  Amazon then automatically populates one seller into the "Buy Box," which is the seller from whom the customer will purchase the product if the customer clicks "Add to Cart."  The identity of the "Buy Box" occupant is not highlighted or obvious to consumers, creating confusion about how and by whom products are sold on Amazon.

(Doc. 82 ¶ 6.)  The relevant consumer confusion here, however, is any confusion caused by Big Birds' reselling Otter's trademarked products.

**2. Big Birds invokes the "first sale" doctrine**

In defending against Otter's infringement and unfair competition claims, Big Bird invokes the "first sale," or exhaustion, doctrine, which provides that "the right of a producer to control distribution of its trademarked product does not extend beyond the first sale of the product." Beltronics, 562 F.3d at 1072 (quoting Australian Gold, 436 F.3d at 1240–41). See generally J. Thomas McCarthy, 4 McCarthy on Trademarks and Unfair Competition ("McCarthy") § 25:41 (5th ed. updated June 2021) (discussing first sale or exhaustion rule). Further, "[t]hose who resell genuine trademarked products are generally not liable for trademark infringement" because no consumer confusion results when "a purchaser . . . does no more than stock, display, and resell a producer's product under the producer's trademark." Beltronics, 562 F.3d at 1071 (quoting Australian Gold, 436 F.3d at 1241) (emphasis added). This is so even though consumers might mistakenly believe the reseller is affiliated with the trademark holder because it is reselling trademarked goods. See 4 McCarthy § 25:41 (citing Mary Kay, Inc. v. Weber, 601 F. Supp. 2d 839, 849 (N.D. Tex. 2009)).

**3. There are material factual disputes as to whether Big Birds is reselling "genuine" Otter products**

It is the trademark holder's burden to "establish that the products sold by the alleged infringer are not 'genuine.'" Iberia Foods Corp. v. Romeo, 150 F.3d 298, 302 (3d Cir. 1998).[5] Invoking several exceptions to the first sale rule, Otter contends that the Otter products that Big Birds is reselling are not "genuine," for two reasons.

---

[5] Otter contends that it is instead Big Birds' burden to show that the Otter products it is selling are genuine. In support of that contention, Otter cites, e.g., Maui Jim, Inc. v.

### a. Otter contends Big Birds is reselling products that are "materially different" from genuine Otter products

The "first sale" doctrine does not apply "'when an alleged infringer sells trademarked goods that are materially different than those sold by the trademark owner'" because "[a] materially different product is not genuine and may generate consumer confusion about the source and the quality of the trademarked product." Beltronics, 562 F.3d at 1072 (quoting Davidoff & CIE, S.A. v. PLD Int'l Corp., 263 F.3d 1297, 1302 (11th Cir. 2001)).  A difference is "material" if "consumers would consider it relevant to a decision about whether to purchase a product."  Id. (quoting Davidoff, 263 F.3d at 1302 (alterations omitted)).

> The purpose of the material differences test is to determine whether the allegedly infringing products are likely to injure the goodwill developed by the trademark owner in the trademarked goods.  When the products sold by the alleged infringer and the trademark owner contain identical marks but are materially different, consumers are likely to be confused about the quality and nature of the trademarked goods.  Sales of the alleged infringer's goods will tarnish the "commercial magnetism" of the trademark, injuring the trademark owner.  In such circumstances, the alleged infringer's

---

SmartBuy Guru Enterprises, 459 F. Supp. 3d 1058 (N.D. Ill. Feb. 24, 2020).  But Maui Jim held only that a defendant invoking the first sale doctrine had the initial burden of showing that it lawfully acquired the goods it is reselling.  Id. at 1081–82.  See generally 4 McCarthy § 25:41 ("The first sale defense is not applicable to goods stolen from the trademark owner because no legally approved 'first sale' has occurred.").  Big Bird has offered evidence that it lawfully acquired the Otter products it is reselling, and Otter does not argue to the contrary.  Big Birds does cite a case indicating that it is the burden of the defendant asserting a first sale defense to establish that the goods it is selling are genuine.  See Samsung Elecs. Am., Inc. v. Yang Kun Chung, No. 3:15-CV-4108-D, 2017 WL 635031, at *4 (N.D. Tex. Feb. 16, 2017) (unreported).  Even if that were the case, Big Birds has asserted sufficient evidence to create a triable issue of fact as to the genuineness of the Otter products it is reselling.  See Maui Jim, 459 F. Supp. 3d at 1084 n.11 (holding that the court's "conclusion would be the same had the burden been Maui Jim's to bear" because Maui Jim's "did enough to convince us that a question of material fact existed as to whether an authorized first sale occurred such that judgment as a matter of law would be rendered inappropriate.").

goods are considered "non-genuine" and the sales of the goods constitutes infringement.

<u>Iberia Foods</u>, 150 F.3d at 303–04 (3d Cir.) (citations, footnote omitted).  Whether the goods Big Birds is reselling are materially different is usually a jury question, <u>see</u> <u>Maui Jim</u>, 459 F. Supp. 3d at 1087 & n.12,[6] on which Otter bears the burden, <u>see</u> <u>Alcon Vision, LLC v. Lens.com, Inc.</u>, No. 18-CV-407 (NG), 2020 WL 5899879, at *14 (E.D.N.Y. Feb. 28, 2020) (magistrate judge's recommendation), <u>adopted</u>, 2020 WL 3989492 (E.D.N.Y. July 15, 2020).

Otter contends that the products Big Birds is reselling as "new" on Amazon are materially different because they are not covered by Otter's limited manufacturer's warranty.  Otter offers a limited manufacturer's warranty on products it sells through its authorized distribution network, but Otter will not honor that warranty for any Otter products, like those Big Birds resells, that are sold outside Otter's authorized distribution network.  "[M]aterial differences may include the warranties . . . associated with" trademarked products.  <u>Beltronics</u>, 562 F.3d at 1073.  There is a disputed issue of fact, however, as to whether Otter actually declines to provide warranty coverage for Otter products sold outside its authorized distribution network.

On Amazon, there is a single catalog or product listing page for each product sold on Amazon.  There is generally only one such page for each product, regardless of the number of entities selling that product on Amazon.  Relevant here, Otter worked

---

[6] <u>See also</u> 4 McCarthy § 25:41 ("The question of the materiality or importance of the alteration is a question of fact requiring an examination of the products and the desires of the target market.").

with Amazon to create a catalog page for each of its products.  These catalog pages inform consumers that each Otter product is covered by a limited manufacturer's warranty; the specific terms of the limited warranties Otter offers varies with the product. Amazon's guidelines for sellers indicate that, a product sold as "new" (as opposed to "used") should still be covered by the manufacturer's warranty, if there is one.  But Amazon warns consumers generally that products sold on Amazon may not be covered by a manufacturer's warranty.

Otter's stated internal policy is to refuse to honor warranty claims made on products sold outside its authorized distribution network, like those Big Birds is reselling. Otter does not identify publicly who is an authorized Otter products seller.  So there is no way for a consumer to know before buying an Otter product on Amazon whether he is buying from an authorized Otter seller.[7]

If a consumer buys an Otter product and then needs to make a claim on the manufacturer's limited warranty, he can either call Otter or go to Otter's website.  On the website, the consumer must identify where he bought the product.  If the consumer indicates that he (unknowingly) bought the Otter product from an unauthorized seller, Otter will replace the product, but will charge a dollar more for shipping and handling than it would charge a consumer who purchased the Otter product from an authorized seller.  Otter describes this process as denying the warranty claim on the unauthorized product and then exercising its discretion to cover it anyway.  But Otter acknowledges

---

[7]  Otter counters that Big Birds does not indicate on its Amazon storefronts that it is <u>not</u> an authorized Otter seller.

11

that the consumer is unaware of any of this and only knows that Otter covered its warranty claim.  That process would not cause consumer confusion.

But there is evidence that when a consumer calls Otter to make a warranty claim, Otter's customer service representative asks the customer where he purchased the product.  If the customer (unknowingly) purchased the product from an unauthorized seller, the Otter customer service representative informs the customer of this fact and states that Otter's limited manufacturer's warranty does not apply to that product. Otter's customer service representatives, however, still have discretion nevertheless to cover the product and they do so "pretty often."  (McPherson depo. at 142.)  So a customer calling Otter to make a warranty claim may be informed that because he bought the Otter product from an unauthorized seller, the Otter manufacturer's warranty does not apply.  But "pretty often" Otter will still give the customer relief.[8]  (Id.)

Based on this evidence, a reasonable jury could find that, although Otter says its manufacturer's warranty does not cover products purchased from unauthorized sellers, Otter actually covers those unauthorized purchases.  On the other hand, a reasonable

---

[8] After discovery ended, Otter's Senior Director of Brand Protection and Corporate Counsel, Kevin McPherson, asserted in a sworn declaration that Otter had, at least for a time, changed the process for making warranty claims on Otter's website "during the era of the Covid-19 pandemic."  (Doc. 82-1 ¶ 36.)  Although McPherson's sworn declaration is not completely clear, at some point in time a consumer trying to make a warranty claim online had to indicate where he bought the Otter product and, if that source was not an authorized Otter seller, the consumer would be told that he could not make the warranty claim online but must contact Otter.  Those calls are handled by Otter customer service representatives who would, if relevant, inform the consumer that he bought an Otter product from an unauthorized seller and so the product was not covered by Otter's limited manufacturer's warranty.  But, the Otter customer service representative still has discretion to give the customer relief.

jury could find, instead, that Otter does disclaim its warranty for products purchased from unauthorized sellers.  A jury will have to resolve whether the Otter products Big Birds is reselling are actually different from the products Otter sells through its authorized distribution network.[9]

"[N]ot all differences are material."  Beltronics, 562 F.3d at 1072 (10th Cir.).  "[A] difference is material if 'consumers [would] consider [it] relevant to a decision about whether to purchase a product.'"  Id. (quoting Davidoff, 263 F.3d at 1302 (2d Cir.)).  Otter has asserted evidence that the existence of a manufacturer's warranty is material, and Big Birds has submitted contrary evidence.  That is sufficient to defeat summary judgment for either party.[10] [11]

---

[9] In Beltronics, the Tenth Circuit recognized that the material difference exception to the first sale doctrine was not limited to physical differences in products but might also be invoked based on differences in warranties or post-sale services.  562 F.3d at 1073.

[10] The parties treat materiality as a fact question and present conflicting evidence on this issue.  The Court accepts that treatment of this issue for purposes of this order.  In any event, it seems undeniable that materiality would have at least a strong factual component.  See Beltronics, 562 F.3d at 1072–73.

[11] The parties agree that consumers will sometimes seek warranty relief from the retail seller from which they bought the product, rather than from the product's manufacturer.  Big Birds asserts that it actually offers a better warranty to its customers than the limited warranty Otter provides.  But there is no evidence that Big Birds notifies consumers about its warranty, either before or after their purchasing an Otter product from Big Birds.  So, while Big Birds' more generous warranty policy might eliminate complaints by some consumers who by happenstance called Big Birds for warranty help, that does not eliminate consumer confusion caused if, in fact, consumers call Otter, believing their Otter product is covered by a limited manufacturer's warranty and it is not.  Further, Amazon's general warning to consumers that products sold on Amazon might not be covered by a manufacturer's warranty does not, at least as a matter of law, eliminate a consumer's reliance on the Otter product pages on Amazon if those product listings expressly stating that they come with a manufacturer's warranty.

13

### b. Otter contends that the products Big Birds is selling are not "genuine" because they are not subject to Otter's quality controls

Otter next asserts that the Otter products Big Birds is reselling are not "genuine" because they are not subject to the quality controls that Otter imposes through its authorized distribution channels.

> Distribution of a product that does not meet the trademark holder's quality control standards may result in the devaluation of the mark by tarnishing its image. If so, the non-conforming product is deemed for Lanham Act purposes not to be the genuine product of the holder, and its distribution constitutes trademark infringement.

Warner-Lambert Co. v. Northside Dev. Corp., 86 F.3d 3, 6 (2d Cir. 1996).

> Because quality control measures may create subtle differences in quality that are difficult to measure but important to consumers, courts do not require trademark owners to show that the actual quality of the inspected goods is measurably higher than that of the uninspected goods.  At the same time, "quality control" is not a talisman the mere utterance of which entitles the trademark owner to judgment. Rather, the test is whether the quality control procedures established by the trademark owner are likely to result in differences between the products such that consumer confusion regarding the sponsorship of the products could injure the trademark owner's goodwill.

Iberia Foods, 150 F.3d at 304 (3d Cir.) (citations omitted; emphasis added).  This "quality control" theory has been applied to perishable products and products that become stale after a time.  See, e.g., Warner-Lambert, 86 F.3d at 4-8 (cough drops); Adolph Coors Co. v. A. Genderson & Sons, Inc., 486 F. Supp. 131, 132-36 (D. Colo. 1980) (beer).  Here, Otter seeks to apply this theory to its cell phone cases, arguing its quality controls are aimed at eliminating the problem of unauthorized sales of damaged or defective cases, or the sales of "used" cases sold as "new," which Otter contends result in negative customer reviews that reflect badly on the Otter brand.

14

To succeed on this theory, "a trademark holder . . . must demonstrate . . . that: (i) it has established legitimate, substantial, and nonpretextual quality control procedures, (ii) it abides by these procedures, and (iii) the non-conforming sales will diminish the value of the mark." Warner-Lambert, 86 F.3d at 6.  "After establishing the three Warner-Lambert factors, a mark holder must have established that the unauthorized reseller either failed to abide by the trademark holder's quality controls, [86 F.3d] at 6, or interfered with the trademark holder's ability to implement its quality controls, Zino [Davidoff], 571 F.3d at 243 [(2d Cir.)]."  Skullcandy, Inc. v. Filter USA, Inc., No. 2:18-CV-00748-DAK, 2019 WL 2568010, at *7 (D. Utah June 21, 2019).

Here, again, there are genuinely disputed issues of fact that preclude summary judgment for either side.

### i. Whether Otter has adopted legitimate, substantial, non-pretextual quality controls

Otter first has to demonstrate that "it has established legitimate, substantial, and nonpretextual quality control procedures."  Warner-Lambert, 86 F.3d at 6.  In Iberia Foods, for example, the Third Circuit held that Iberia's "'quality control' inspection of every shipment" of Mistolin brand cleaning supplies it received from the company Iberia paid to manufacture Mistolin cleaning products was not a sufficient "quality control" to distinguish Iberia's Mistolin cleaning products from the Mistolin cleaning products being resold by an alleged infringer.  150 F.3d at 304–06.  Iberia's inspection involved only a quick look to see if any products had been "damaged in shipping and whether random samples look[ed] and smell[ed] right."  Id. at 305.  The Third Circuit noted that Iberia's "quality controls" "hardly set any standard at all."  Id. at 306.

15

Whether Otter's quality controls at issue here are legitimate, substantial and non-pretextual is a question of fact usually for the jury.  See Alcon Vision, 2020 WL 5899879, at *19 ("whether a quality control measure is pretextual is a factual question").

**Substantial.**  Many of Otter's quality controls are very general and, like the quality controls addressed in Iberia Foods, "hardly set any standard at all." [12]  Id. at 306.  Summarizing, Otter requires its authorized sellers to do the following: inspect Otter products upon receiving them according to "industry standards" and remove any products damaged in shipping; handle and store Otter products and its packaging with care, using a "basic standard of care" or "industry standard" so that Otter products and their packaging are not damaged; to choose an "appropriate" means to ship Otter products to customers; and not to repackage Otter products.  (McPherson depo. 51, 56–57.)  The authorized sellers must have knowledgeable customer service representatives who can answer customer's questions about Otter products.  Otter sends field representatives to provide its larger authorized sellers with training on Otter products, Otter's authorized distributors can provide information to authorized sellers, and Otter has a "portal" that any authorized seller can access for information about Otter products.  Otter will issue any product recalls through its authorized network of distributors and sellers, although Otter has never needed to recall any of its products.

---

[12] The Court has reviewed all of the quality controls Otter submitted to the Court.  Here, the Court relies on the summary of those quality controls to which Kevin McPherson, Otter's Senior Director of Brand Protection and Corporate Counsel, testified during his deposition.

Otter also has arguably more substantive quality controls.  For example, it precludes its authorized Amazon and internet sellers from selling Otter products anonymously and requires these sellers, instead, clearly to provide consumers with the seller's contact information.  These authorized sellers must address any negative consumer reviews they receive and provide for Otter's review any customer feedback the seller receives.  Although many of Otter's quality controls are generic statements of industry standards, then, a jury could find that, considered as a whole, they are legitimate, substantial quality controls.

Big Birds asserts that these quality controls are not substantial because they do not apply to the vast majority of authorized Otter product sales.  A jury could find that. Sixty percent of Otter's cell-phone-case sales, for example, are made to cell phone carriers like Verizon and T-Mobile.  Thirty percent of Otter's cell-phone-case sales are to national retailers, like Best Buy, Target, Wal-Mart and Amazon.  These larger sellers— the cell phone carriers and the national retailers—sign different contracts with Otter than Otter's smaller sellers.  It is not clear what the terms of those agreements with the larger sellers are with regard to compliance with Otter's quality controls.  Amazon's first-party sales (that is, when Amazon itself sells the Otter product), which account for ten percent of Otter's cell-phone-case sales, Otter asserts only that it sent its quality control guidelines to Amazon.  There is evidence that Otter does not know how Amazon stores store Otter products.

Ten percent of Otter's cell-phone-case sales are made through its approximately 4,900 smaller authorized sellers and five authorized secondary resellers, most of which

have agreed to comply with Otter's quality controls.  A jury could find that Otter's requiring these approximately 4,900 smaller authorized sellers to comply with its quality controls makes those quality controls legitimate and substantial.  But a jury could also make the contrary finding.

**Pretextual.**  The evidence is also disputed as to whether Otter's quality controls are pretextual.  Otter presented evidence that it adopted quality controls in late 2018 to combat sales on Amazon of Otter products that generated negative consumer reviews, which Otter feared negatively impacted the sales of its products and would result in a less desirable placement on Amazon's list of sellers.  Otter attributed the sales producing these negative consumer reviews to unauthorized resellers.

On the other hand, as explained in the next section of this order, Big Birds presented evidence that Otter only weakly enforces its quality controls against its authorized sellers, but immediately after adopting these quality controls, began sending cease-and-desist letters to and suing unauthorized resellers who resell Otter products on Amazon.  There is sufficient evidence before the Court, then, from which a reasonable jury could find either that Otter's quality controls are or are not legitimate, substantial, and non-pretextual.

### ii. Whether Otter abides by its quality controls

Next, Otter must establish that it abides by its own quality controls.  See Warner-Lambert, 86 F.3d at 6.  Otter requires its approximately 4,900 smaller sellers and five secondary resellers to sign a contract agreeing to follow Otter's quality controls.  But Otter's larger customers, which account for ninety percent of Otter's cell-phone-case

sales, are apparently not contractually obligated to follow Otter's quality controls, or at least there is no evidence indicating that they are so obligated.

As far as enforcing its quality controls, Otter has salespeople who visit the larger retailers and who "inspected their facilities or at least did a walkthrough." (McPherson depo. 53.) Once three Otter employees toured one Amazon distribution center in January 2019, but there is evidence that Otter is not certain how Amazon stores Otter products. Otter does test buys to check Amazon's handling of Otter products. Otter further acknowledges that it has not yet inspected most of the premises of its 4,900 smaller sellers to insure compliance with Otter's storage and handling requirements, but it intends to institute a "robust" inspection program after the pandemic. (Id.) Every quarter Otter reviews any negative feedback its authorized resellers receive and does a test buy from a few of these 4,900 sellers. If Otter receives through these test buys undamaged and properly packaged genuine Otter products, then Otter assumes that the particular authorized seller from which Otter bought the product must be complying with Otter's quality controls. If Otter receives damaged or "used" Otter products sold as "new," it communicates these problems to the authorized seller. There is also evidence that, despite its quality controls precluding repackaging, Otter sometimes permits its secondary resellers to repackage Otter products shipped to them in bulk.

While the evidence establishes that Otter only weakly enforces its quality controls to insure its authorized sellers are complying, it is sufficient to create a triable question of fact.

### iii. Whether non-conforming sales will diminish the value of Otter's marks

Otter must also establish that sales of Otter products that were not subject to its quality controls will diminish the value of its trademarks.  See Warner-Lambert, 86 F.3d at 6.  Otter has provided some evidence that its quality controls are at least aimed at minimizing negative customer reviews on Amazon that will reflect badly on the Otter brand.

### iv. Whether Big Birds fails to comply or interferes with Otter's quality controls

Otter must also establish that Big Birds either failed to abide by Otter's quality controls, or interfered with Otter's ability to implement its quality controls.  See Skullcandy, 2019 WL 2568010, at *7.  Big Birds does not assert that it complies with Otter's quality controls.  On the other hand, Big Birds asserts that it follows industry practices.  Further, Otter made a number of test buys from Big Birds without receiving any damaged, defective, or improperly packaged products, which is how Otter measures compliance by its authorized sellers.  Furthermore, Big Birds has a higher customer feedback ranking on Amazon than Otter or its authorized Amazon sellers.

### 4.  Conclusion as to Otter's infringement claims

Otter asserts that Big Birds is not reselling "genuine" Otter products because they are neither covered by Otter's limited manufacturer's warranty nor subject to Otter's quality controls.  There are disputed issues of material fact as to whether the Otter

products that Big Birds is reselling are "genuine" and thus, not infringing under the first

sale rule.  Neither party, then, is entitled to summary judgment.[13]

## B.  Claim 2: False advertising under the Lanham Act, 15 U.S.C. § 1125(a)

To succeed on its false advertising claim, Otter has to prove

(1) that [Big Birds] made material false or misleading representations of fact in connection with the commercial advertising or promotion of its product; (2) in commerce; (3) that are either likely to cause confusion or mistake as to (a) the origin, association or approval of the product with or by another, or (b) the characteristics of the goods or services; and (4) injure[d] the plaintiff.

Digital Ally, Inc. v. Util. Assocs., Inc., 882 F.3d 974, 978 (10th Cir. 2018) (quoting World

Wide Ass'n of Specialty Programs v. Pure, Inc., 450 F.3d 1132, 1140 (10th Cir. 2006)).

In support of its false advertising claim, Otter contends that Big Birds is "making

false representations of fact in commerce by knowingly advertising products that are not

covered by Otter Warranty as 'new' on Amazon listings that state the products are

covered by the Warranty."  (Doc. 82 at 18.)  As previously explained, there is a disputed

issue of fact as to whether Otter actually honors warranty claims on products sold by

unauthorized sellers like Big Birds.  If so, Big Birds did not make a false statement.

---

[13] Big Birds' further arguments for why it is, nevertheless, still entitled to summary judgment are not persuasive.  Briefly, Otter will be entitled to some relief, including injunctive relief and disgorgement, if the jury finds that the Otter products Big Birds is reselling are infringing, even without proof of additional harm.  Further, Big Birds does not need a license to resell genuine Otter products.  4 McCarthy § 25:41.  But if the products Big Birds is reselling are not genuine, Big Birds does not adequately explain how the license and right to sublicense that Otter grants Amazon to use Otter product information, including trademarks in that information, protects Big Birds from liability for that infringement.

Big Birds further contends that if there is any false advertisement, it is Otter's Amazon listings, which indicate Otter products come with a manufacturer's limited warranty, and not Big Birds' statement that the Otter products it sells are "new" as that term is defined on Amazon.  That is a question for the jury to resolve.  See generally Healthpoint, Ltd. v. Stratus Pharms., Inc., 273 F. Supp. 2d 871, 889 (W.D. Tex. 2001) (whether statements are false is question for jury).

Otter has presented sufficient evidence on the remaining elements of its false advertising claim to survive summary judgment.  Big Birds' arguments to the contrary unavailing.  In particular, the Supreme Court has rejected the argument that Otter must establish that it is Big Birds' direct competitor.  See Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118, 134, 136 (2014).  Neither party, then, is entitled to summary judgment on the false advertising claim.

## C. Claim 6: Deceptive trade practices under the Colorado Consumer Protection Act, Colo. Rev. Stat. §§ 6-1-1 through 6-1-115

Plaintiffs seek summary judgment on their state-law statutory deceptive trade practices claim.  To recover on that claim, Otter must establish:

> (1) that [Big Birds] engaged in an unfair or deceptive trade practice; (2) that the challenged practice occurred in the course of defendant's business, vocation, or occupation; (3) that it significantly impacts the public as actual or potential consumers of the defendant's goods, services, or property; (4) that the plaintiff suffered injury in fact to a legally protected interest; and (5) that the challenged practice caused the plaintiff's injury.

Garcia v. Medved Chevrolet, Inc., 263 P.3d 92, 98 (Colo. 2011) (quoting Hall v. Walter, 969 P.2d 224, 235 (Colo. 1998)).  Otter bases this claim on its allegations that Big Birds has engaged in the unfair or deceptive trade practice of "knowingly selling products on

22

Amazon that are not covered by the Otter Warranty, while claiming the contrary."  (Doc. 82 at 19.)  See Colo. Rev. Stat. § 6-1-105(e), (r) (defining unfair or deceptive trade practices to include: knowingly or recklessly making false representations, and stating products are guaranteed without stating applicable conditions or limitations).  As previously explained, there are genuinely disputed issues of material fact as to whether Big Birds made material misrepresentations that the Otter products it was selling were covered by Otter's manufacturer's warranty.  Otter, therefore, is not entitled to summary judgment on this claim.

### V. BIG BIRD'S COUNTERCLAIMS

Otter moved for summary judgment on Big Bird's first and third counterclaims.[14] Big Birds' first counterclaim seeks a declaratory judgment, see 28 U.S.C. § 2201, that Big Birds is not infringing Otter's trademarks.  As just explained, genuine issues of material fact as to whether the Otter products Big Birds is reselling are genuine and thus covered by the first sale doctrine preclude summary judgment on this counterclaim.

Big Birds' third counterclaim, asserted under Colorado law, alleges that Otter has intentionally interfered with Big Birds' existing or prospective economic advantage by interfering with Big Birds' business relationship with Amazon and consumers.  To recover under that claim, Big Birds must prove that 1) "it had either a valid existing contract with a third party or expected to enter into a contract with a third party," 2) Otter

---

[14] Otter has not moved for summary judgment on Big Bird's second counterclaim, seeking a declaratory judgment that Big Bird's "purchase, distribution, marketing and resale" of Otter products "is permissible, proper, and lawful," and thus does not amount to tortious interference with Otter's business relationships.  (Doc. 41 ¶ 55.)

"induced or otherwise caused the third party to breach the contract or not to enter into the contractual relation," and 3) Otter "did so intentionally and via improper means." Tara Woods Ltd. P'ship v. Fannie Mae, 731 F. Supp. 2d 1103, 1119 (D. Colo. 2010) (citing Harris Group, Inc. v. Robinson, 209 P.3d 1188, 1195–96 (Colo. App.2009), aff'd, 566 F. App'x 681 (10th Cir. 2014) (unpublished)).

In defending against summary judgment, Big Birds relies on 1) its existing contractual relationship with Amazon "under which Big Birds is permitted—by sublicense—to list genuine Otter Products on Amazon detail pages that includes [Otter's] trademarks"; and 2) Big Birds' relationship with its suppliers, which Otter has harassed.  (Doc. 99 at 20.)  But, as Otter accurately asserts, Big Birds has failed to present any evidence that Otter "induced any third party to refuse to enter into or continue a contractual relationship with" Big Birds (Doc. 82 at 20).  In his deposition, Defendant Paige testified that Amazon had taken no adverse action against Big Birds as a result of Otter's actions.  Further, Paige testified that one of his Otter product suppliers at one time "felt intimidated and they were not going to do business with" Big Birds, and "[e]ven now they're doing it but they are—in a sense of intimidation. . . . [T]here's a certain fear which is interfering with the relationship that we have."  (Paige depo. 194.)  That alone is insufficient to create a triable issue of fact as to whether Otter "induced or otherwise caused" Big Birds' distributors "to breach the contract or not to enter into the contractual relation."  Tara Woods, 731 F. Supp. 2d at 1119.  Otter is entitled to summary judgment on this counterclaim.

## VI. Conclusion

The Court GRANTS Otter summary judgment on Big Birds' third counterclaim and otherwise DENIES the parties' cross-motions for summary judgment.  The parties are directed to contact the Court within seven days of the entry of this order to schedule a trial.

DONE AND SIGNED this 30th day of September, 2021.


BY THE COURT:

*s/ David M. Ebel*

_____

U. S. Circuit Court Judge